Andrew S. Hanen, United States District Judge
Before the Court are Defendant's Motion for Summary Judgment (Doc. No. 19) filed by UNUM Life Insurance Company of America ("Unum" or "Defendant") and Plaintiff's Motion for Summary Judgment (Doc. No. 20) filed by Henry Brandt ("Brandt" or "Plaintiff"). The parties have filed their various responses, replies, and sur-replies to each Motion.
The Court, having considered the various motions, responses, and replies and the corresponding summary judgment evidence, hereby denies Defendant's Motion and grants Plaintiff's Motion.
I. History of the Proceedings
This is an action brought under the Employee Retirement Income Security Act ("ERISA") to recover life insurance benefits. Plaintiff has filed this action against Defendant for wrongful denial of the dependent life insurance benefits in which his late wife was the insured. Plaintiff is the would-be beneficiary in a benefits plan in place for employees of Enterprise Products Company and administered by Defendant pursuant to 29 U.S.C. § 1132(a)(1)(B) of ERISA. Following the death of the insured, Unum determined that the life benefit was not payable because "the dependent coverage never became effective." As a result, Unum denied Plaintiff's claim for life insurance benefits. Plaintiff administratively appealed this decision, and on appeal, Unum affirmed the denial. The parties agree that Plaintiff exhausted his pre-suit remedies and that this suit is ripe for adjudication by this Court.
II. Facts Established by the Summary Judgment Evidence
a. The Policy
On July 25, 2015, Plaintiff as part of his benefits package as an employee of Enterprise Products Company enrolled in a group life insurance policy (the "Policy") through his employer. It was administered by Unum. This package allowed for dependent coverage in addition to the coverage provided to the employee. Plaintiff sought to enroll his wife, Mary Brandt ("Mrs. Brandt" or "the Decedent"), in a life insurance policy with a benefit amount of $ 100,000. Per the terms of the package, policies in excess of $ 75,000 required "Evidence of Insurability." In response to Plaintiff's request for a $ 100,000 policy benefit, Unum sent various medically-related forms for the Brandts to fill out, but this was never done. The Brandts' failure to provide the required "Evidence of Insurability"
*686 resulted in the benefit amount defaulting to the $ 75,000 amount. Consequently, if there actually is an effective policy, it is only a policy for $ 75,000.
Plaintiff is the named beneficiary under the Policy, and the Decedent is the named insured. The "effective date" listed on the Policy is July 24, 2015. Despite this date, both parties acknowledge that the Policy contains a "delayed effective date" provision for situations where the insured eligible dependent is "Totally Disabled." This provision is excerpted below:
WHAT IF YOUR DEPENDENT IS TOTALLY DISABLED ON THE DATE YOUR DEPENDENT'S COVERAGE WOULD NORMALLY BEGIN?
If your eligible dependent is totally disabled , your dependent's coverage will begin on the first of the month coincident with or next following the date your eligible dependent no longer is totally disabled. This provision does not apply to a newborn child while dependent insurance is in effect.
(Doc. No. 19, Ex. A at 34). The Policy defines "Totally Disabled" as:
TOTALLY DISABLED means that, as a result of an injury, a sickness or a disorder,
Your dependent spouse:
- is confined in a hospital or similar institution;
- is unable to perform two or more activities of daily living (ADLs) because of a physical or mental incapacity resulting from an injury or a sickness;
- is cognitively impaired ;
- is receiving or is entitled to receive any disability income from any source due to any sickness or injury;
- is receiving chemotherapy, radiation therapy or dialysis treatment;
- is confined at home under the care of a physician for a sickness or injury; or
- has a life threatening condition .
(Doc. No. 19, Ex. A at 60) (emphasis in original). The last bullet point, "life threatening condition," is the controlling provision in the present case. The Policy further defines "life threatening condition" as follows:
LIFE THREATENING CONDITION is a critical health condition that possibly could result in your dependent's loss of life.
(Doc. No. 19, Ex. A at 59).
The evidence shows that the Decedent died on October 30, 2015-a little over three months after she applied for the Policy-from a "myocardial infarction" (more colloquially known as a heart attack ). On November 2, 2015, Plaintiff filed a claim for death benefits under the Policy.
b. The Decedent's Medical History
Once it received Plaintiff's claim, Unum began to process it. Unum collected some of the Decedent's medical records as a part of its routine investigation. The records it obtained were solely from Huntsville Memorial Hospital (Madisonville), the hospital in which Mrs. Brandt died and had previously on occasion sought treatment. Her medical records establish that over the years she had suffered from and had been treated for several serious medical conditions. The records demonstrate that the Decedent suffered from Type II diabetes, coronary artery disease, and hypertension, was a smoker, and had been deemed obese by healthcare providers. (Doc. No. 19, Ex. B at 345). Her diabetes caused her to suffer from edema in her lower extremities and diabetic ulcers. Most importantly, in either 2008 or 2010, the records show that the Decedent underwent a five-vessel bypass surgery.[1] From the *687 date of the bypass surgery until the date of her death, the records indicate that the Decedent was hospitalized at least four times for complications related to diabetes or her cardio-pulmonary situation.
On November 15, 2014, the Decedent went to the Emergency Room of Huntsville Memorial Hospital complaining of shortness of breath. The Decedent had a chest x-ray which, records indicate, led the doctors to conclude that the Decedent had "increased vascular congestion." Doctors also concluded that the Decedent experienced "Cardiomegaly with mild vascular engorgement some of which may be technique related." (Doc. No. 19, Ex. B at 508-09). The Decedent was then discharged to College Station Medical Center in "stable condition."
From February 6 to March 15, 2015, the Decedent was in and out of the hospital complaining of a painful, slow-healing ulcer on the fifth toe of her right foot. Records indicate that ulcers are commonly caused by the Decedent's Type II diabetes and the consequential pressure caused by articles of clothing, such as shoes. (Doc. No. 19, Ex. B at 250-52). On March 13, the Decedent was documented as having high blood pressure of 183/81.
Hospital records indicate that on August 24, 2015, the Decedent returned to the hospital complaining of a skin abscess on her upper left buttocks. Medical records indicate that during this visit, medical providers once again found that she was still having problems with high blood pressure.
On October 30, 2015, at 1:00 a.m., the Decedent apparently attempted to interrupt the repossession of her car. She began to experience health problems and was taken to the hospital by ambulance at 1:57 a.m. complaining of shortness of breath and chest pain. Medical records indicate that the pain and shortness of breath began following the above-described confrontation, but also note that the Decedent had been ill at home for the five days preceding the incident. (Doc. No. 19, Ex. B at 216). She remained alive for less than an hour. The Decedent's death certificate states that she died at 2:32 a.m. from myocardial infarction. Emergency room records recount the Decedent's cardiac disease, hypertension, and hyperlipidemia. (Doc. No. 19, Ex. B at 195).
III. Denial of Plaintiff's Claim and Appeal
After reviewing the Decedent's medical records, Unum denied Plaintiff's claim. Unum found that the Decedent was "Totally Disabled" on the purported start date of the policy and remained Totally Disabled until her death. Consequently, according to the terms of the benefit plan, the policy never became effective. Unum informed Plaintiff of the denial by letter dated January 8, 2016. Then, on January 29, 2016, and again on February 4, 2016, Plaintiff's former attorney, Kevin Knight ("Knight"), sent letters to Unum informing the insurance company that he had been hired to represent Plaintiff and intended to sue unless payment of the benefits was made within 60 days. In these letters, Knight requested access to all records and evidence Unum used in making its decision.
In a letter dated February 17, Unum stated that it understood his February 4th letter to be an appeal and would treat it as such. Knight never complained about this characterization. The Court will recount the entire appellate chronology below, as it pertains to a point of error raised by Plaintiff. By letter dated March 30, 2016, Unum *688 informed Plaintiff and Knight that it had affirmed its decision on appeal.
By letter dated January 5, 2017, Plaintiff's current attorney, Marc Whitehead, informed Unum of "Mr. Henry Brandt's intent to appeal [its] decision denying benefits under the" Policy. (Doc. No. 19, Ex. B at 609). On January 17, 2017, Unum responded:
Dear Attorney Whitehead:
We are writing to you today in response to your letter of January 5, 2017.
You have indicated that your client intends to appeal and have made requests for documents to assist him in that appeal.
Please be aware that your client, through his previous attorney, already exercised his right to an appeal. We rendered our appeal decision on March 30, 2016, and have enclosed a copy for you.
We previously provided your client's attorney with a complete copy of the administrative record, which was sent to Kevin Roger Knight on February 17, 2016.
As noted in the appeal decision, your client has a right to bring a civil suit under ERISA if he disagrees with our decision. The policy contains the following time limit on bringing suit:
"WHAT ARE THR [sic] TIME LIMITS FOR LEGAL PROCEEDINGS?
You or your authorized representative can start legal action regarding a claim 60 days after the proof of claim has been given and up to 3 years from the time proof of claim is required, unless otherwise provided under federal law."
(Doc. No. 19, Ex. B at 616) (emphasis in original). Plaintiff filed suit thereafter, on October 24, 2017.
IV. Full and Fair Review
While not pleading the issue as a cause of action, Plaintiff in his Complaint claims he was not given a full and fair appellate review because it is his opinion that Unum "in its denial, discounted the opinions of Decedent's autopsy report, a consulting pathologist, and the testimony of the medical examiner." (Doc. No. 1 at 5). The Complaint does not reference the location of any of this information in the record, but this Court is at a loss to find any testimony of anyone in the record much less that of the medical examiner.
This criticism is brought forth in Plaintiff's Motion for Summary Judgment and Brief in Support, wherein he claims Defendant "effectively estopped Plaintiff from appealing Unum's determination of his late wife's coverage under the Policy." (Doc. No. 20 at 25). He cites 29 C.F.R. § 2560.503-1(h)(2)(iv) to the effect that claimants are entitled to a review that considers "all comments, documents, records, and other information submitted by the claimant relating to the claim ." (Doc. No. 20 at 25) (emphasis in original). He contends that he did not get this opportunity.
Unum contends that this procedurally-based claim is not one that can be considered as a ground for reversing its coverage decision. Neither side refers this Court to any guiding statute, regulation, case law, or legal principle that would control the outcome of this disagreement. The Court finds no factual basis for Plaintiff's claims, and therefore, there is no need to reach the actual legal question as to whether this claim can be the basis of a summary judgment in Plaintiff's favor on the benefits issue.
The exact chronology of Unum's investigation, as laid out in the record, is as follows:
(1) November 2, 2015 - Plaintiff files a claim for insurance benefits.
(2) November 3, 2015 - Unum acknowledges receipt of Plaintiff's *689 claim and two days later interviews Plaintiff and subsequently receives medical authorization from Plaintiff.
(3) November 9, 2015 - Unum acquires the Death Certificate.
(4) November 12, 2015, and then again on November 24, 2015 - Defendant seeks the medical records from Huntsville Memorial Hospital in Madisonville, Texas. On December 2, 2015, and then again on December 30, 2015, Unum lets Plaintiff know that it is still waiting on the records. It finally receives those records in late December or early January.
(5) First week of January 2016 - Defendant performs the in-house review.
(6) January 8, 2016 - Unum advises Plaintiff it would not pay the claim. This denial contained its reasoning and laid out Plaintiffs administrative appellate rights.
(7) January 29, 2016 - Knight, on Plaintiff's behalf, writes Unum stating he has been hired to investigate the matter and requests a copy of the application, policy, and all materials reviewed and relied upon in reaching Unum's decision.
(8) February 4, 2016 - Knight writes Unum, giving them 60 days to pay the benefits or get sued and again asking for records.
(9) February 17, 2016 - Unum writes Knight that it would consider his letter on Plaintiff's behalf as an appeal and requests that Knight send it any information he wants it to consider. It asks Knight to call and help set up a schedule for the review. It also provides a password protected disk containing its administrative record.
(10) February 24, 2016 - Knight sets an April 8, 2016 deadline for Unum to pay the benefits.
(11) March 2, 2016 - Knight notifies Unum he cannot open the disk. Unum overnights a substitute disk that is received the next day.
(12) March 16, 2016 - Unum advises Knight that it has not heard from him and has not received any information from him to include in its review.
(13) March 22, 2016 - Knight faxes a letter stating that he still cannot open the disk.
(14) March 24, 2016 - Unum contacts Knight's office and confirms with Knight's staff that they could open the disk.
(15) March 24, 2016 - Unum sends Knight a letter again requesting that he send any information he wants Unum to consider.
(16) March 30, 2016 - Within the deadline set by Plaintiff's attorney, Unum completes its appellate review and informs Plaintiff and his attorney of its adverse decision.
As is evident from the record, Defendant solicited information from Plaintiff as early as February 17, 2016. A month later, on March 16, it wrote Plaintiff's lawyer again and reminded him that it had not received any information from him. On March 24 it sent Plaintiff's counsel yet another request for any information that he wanted Unum to consider.
Accordingly, on three different occasions Unum sent requests for information, and Plaintiff (or his attorney) did not respond to any of them. While it is true Plaintiff's counsel could not open the original disk Unum sent him, once informed, Unum sent a replacement overnight. Thereafter, when counsel finally informed Unum his office *690 was still having technical troubles, Unum contacted his office within 48 hours and made sure his office could access the record.
Plaintiff's counsel never asked for more time or in any way responded to any of Unum's solicitation for information. He never responded to Unum's request to help establish a schedule. Unum went over and above what was required, and Plaintiff's counsel, other than imposing an arbitrary deadline for a decision, met every request with silence. Consequently, if there are any procedural problems with the way Plaintiff's claim was handled, they did not originate with Unum.
V. Summary Judgment Standard
Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." Triple Tee Golf, Inc. v. Nike, Inc. , 485 F.3d 253, 261 (5th Cir. 2007) (citing Celotex Corp. v. Catrett , 477 U.S. 317, 322-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). Once a movant submits a properly supported motion, the burden shifts to the nonmovant to show that the Court should not grant the motion. Celotex Corp. , 477 U.S. at 321-25, 106 S.Ct. 2548. The nonmovant then must provide specific facts showing that there is a genuine dispute. Id. at 324, 106 S.Ct. 2548 ; Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. Id. at 255, 106 S.Ct. 2505.
VI. Controlling Law Concerning ERISA Review and Summary Judgments
29 U.S.C. § 1132(a)(1)(B) permits a person who was denied ERISA benefits under an employee benefit plan to appeal that decision to federal court. The Supreme Court has held that the denial of benefits should be reviewed by the district courts using a "de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Fifth Circuit, sitting en banc in Ariana M. v. Humana Health Plan of Tex., Inc. , 884 F.3d 246 (5th Cir. 2018), interpreted this dictate to require district courts to review both legal (plan interpretation) and factual (eligibility for benefits) issues using a de novo standard (overruling its prior panel decision in Pierre v. Conn. Gen. Life Ins. Co. , 932 F.2d 1552 (5th Cir. 1991) ).
The majority described its prior precedents and why reviewing all facets de novo comported with those decisions:
Our leading case in this area is Vega v. National Life Insurance Services, Inc. , 188 F.3d 287 (5th Cir. 1999) (en banc), overruled on other grounds by Metro. Life Ins. Co. v. Glenn , 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Under Vega , a plan administrator must identify evidence in the administrative record, giving claimants a chance to contest whether that record is complete. Id. at 299. Once the record is finalized, a district court must remain within its bounds in conducting a review of the administrator's findings, even in the face *691 of disputed facts. Id. Vega permits departure from this rule only in very limited circumstances. One exception allows a district court to admit evidence to explain how the administrator has interpreted the plan's terms in previous instances. Id. (citing Wildbur v. ARCO Chem. Co., 974 F.2d 631, 639 n.15 (5th Cir. 1992) ). Another allows a district court to admit evidence, including expert opinions, to assist in the understanding of medical terminology related to a benefits claim. Id. Those situations are not actually expanding the evidence on which the merits are evaluated but providing context to help the court evaluate the administrative record.
Although some of Vega's reasoning for limiting the district court record to what was before the administrator depended on the abuse-of-discretion context, other interests it recognized support the same rule for de novo review. Among those is the interest in encouraging parties to resolve their dispute at the administrative stage. Id. at 300. A different standard of review also does not undermine Vega's observation that there is not a "particularly high bar to a party's seeking to introduce evidence into the administrative record." Id. And generally limiting the evidence to what was in front of the plan administrator when a dispute ends up in court allows for speedier resolution. Id.
In short, overruling Pierre while adhering to Vega in the context of de novo review serves the twin ERISA goals of allowing for efficient yet meaningful judicial review. See 29 U.S.C. § 1001(b) (stating that ERISA is intended to provide "ready access to the Federal courts"); Firestone , 489 U.S. at 113-14, 109 S.Ct. 948 (explaining that a deferential default standard "would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted"). Vega will continue to provide the guiding principles on the scope of the record for future cases that apply de novo review to fact-based benefit denials.
Id. at 256-57.
The only real exception remaining for applying an abuse of discretion standard is the one set out in Firestone : if the plan specifically gives the administrator discretionary authority. Several states, including Texas, have passed statutes prohibiting such clauses. See Tex. Ins. Code § 1701.062(a). Some have argued that state statutes that prohibit discretionary clauses are ineffective because they are preempted. The Fifth Circuit in Ariana M. elected to forego addressing this issue because the insurer did not raise that point. Similarly, this Court need not address this point, as Unum has conceded in its briefing that this Court should apply a de novo standard. (Doc. No. 19 at 8). That being the case, the Court need not analyze the actual policy language to determine if its delegation of discretion to the administrator qualifies under the Firestone exception.
While there could have been questions about what legal standards are to be used to weigh the evidence, there are no questions about the procedural aspects.
"Standard summary judgment rules control in ERISA cases." Cooper v. Hewlett-Packard Co. , 592 F.3d 645, 651 (5th Cir. 2009) (internal quotation marks omitted). We review a "district court's grant of summary judgment de novo, applying the same standards as the district court." Id. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When parties file cross-motions for summary judgment, we review each party's motion independently, viewing the evidence *692 and inferences in the light most favorable to the nonmoving party." Duval v. N. Assur. Co. of Am. , 722 F.3d 300, 303 (5th Cir. 2013) (internal quotation marks omitted).
Green v. Life Ins. Co. of N. Am. , 754 F.3d 324, 329 (5th Cir. 2014).
The manner in which the actual plan is interpreted is also well-established.
"Federal common law governs rights and obligations stemming from ERISA-regulated plans, including the interpretation" of policy provisions at the heart of this dispute. Provident Life & Accident Ins. Co. v. Sharpless , 364 F.3d 634, 641 (5th Cir. 2004). "When construing ERISA plan provisions, courts are to give the language of an insurance contract its ordinary and generally accepted meaning if such a meaning exists." Id. We "interpret the contract language in an ordinary and popular sense as would a person of average intelligence and experience, such that the language is given its generally accepted meaning if there is one." Wegner v. Standard Ins. Co. , 129 F.3d 814, 818 (5th Cir. 1997) (internal quotation marks omitted). "Only if the plan terms remain ambiguous after applying ordinary principles of contract interpretation are we compelled to apply the rule of contra proferentum and construe the terms strictly in favor of the insured." Id.
Id. at 331.
Where policy disputes, such as this one, are governed by federal law, courts use state contract law to interpret policy language.
If the policy language is ambiguous, then the court should construe the policy against the drafter, United, under the rule of contra proferentem . We may consider Texas law in this federal-common-law case to determine the applicable federal common law. "Whether an insurance contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole ...." "A contract is unambiguous if it can be given a definite or certain legal meaning." "Ambiguity does not arise because of a 'simple lack of clarity,' or because the parties proffer different interpretations of the contract." But a contract is ambiguous if "it is subject to two or more reasonable interpretations after applying the pertinent canons of construction." However, the policy language is unambiguous "after applying ordinary principles of contract interpretation."
Ramirez v. United of Omaha Life Ins. Co. , 872 F.3d 721, 728-29 (5th Cir. 2017) (citations omitted).
VII. Plaintiff's Claim for Benefits
As stated earlier, Plaintiff enrolled his wife for the maximum amount of insurance one could get under the plan without filing insurability forms. The form was dated July 25, 2015-a little more than three months before Mrs. Brandt passed away.[2] The Policy contained this pertinent provision that in effect, delayed the inception of coverage:
WHAT IF YOUR DEPENDENT IS TOTALLY DISABLED ON THE DATE YOUR DEPENDENT'S COVERAGE WOULD NORMALLY BEGIN?
If your eligible dependent is totally disabled , your dependent's coverage will begin on the date your eligible dependent no longer is totally disabled. This provision does not apply to a newborn *693 child while dependent insurance is in effect.[3]
(Doc. No. 19, Ex. Bat 34).
Thus, if one were Totally Disabled when the application is tendered, the insurance policy would not become effective until the insured (Mrs. Brandt) was no longer Totally Disabled. Unum contends that Mrs. Brandt was Totally Disabled, as that term is defined by the Policy, in July of 2015 and remained so until her death. Consequently, according to Unum, the Policy never became effective.
Plaintiff obviously disagrees. He maintains that his wife was not Totally Disabled. Plaintiff argues that the Decedent's bypass surgery was 8-9 years earlier, that she functioned normally on a day to day basis, and that she worked full time. That being the case, he concludes she could not have been Totally Disabled. Further, he notes that although the record demonstrates multiple hospitalizations where Mrs. Brandt was treated and discharged, Mrs. Brandt was always discharged with very few restrictions or prescriptions. He concludes that no hospital would discharge a patient suffering from a Life Threatening Condition.
The terms "Totally Disabled" and "Life Threatening Condition" are defined in the Policy. As such, Plaintiff's personal assessment of his wife's abilities or a lay person's common understanding of the meaning of "totally disabled" does not control. The dispute must therefore be resolved by comparing the administrative record with the Policy's definition of "Totally Disabled." As stated earlier, the Policy in pertinent part reads as follows:
TOTALLY DISABLED means that, as a result of an injury, a sickness, or a disorder,
Your dependent spouse:
- Is confined in a hospital or similar institution;
- Is unable to perform two or more activities of daily living (ADLs) because of a physical or mental incapacity resulting from an injury or a sickness;
- Is cognitively impaired;
- Is receiving or is entitled to receive any disability income from any source due to any sickness or injury;
- Is receiving chemotherapy, radiation therapy or dialysis treatment;
- Is confined at home under the care of a physician for a sickness or injury; or
- Has a life threatening condition .
LIFE THREATENING CONDITION is a critical health condition that possibly *694 could result in your dependent's loss of life.
(Doc. No. 19, Ex. C at 596-97).
Defendant decided that the Policy never became effective because Mrs. Brandt had a Life Threatening Condition (as defined above) at the time she applied and that this condition was never resolved. It found that she had "severe coronary artery disease and chronic uncontrolled diabetes and hypertension." (Id. at 596).
The basis for Unum's decision was summarized in the letter denying Plaintiff's appeal:
Mrs. Brandt was seen in the emergency room at Huntsville Memorial Hospital on November 15, 2014, for shortness of breath and she was diagnosed with an exacerbation of her chronic heart failure. Her chest x-ray showed an enlarged heart, pulmonary vascular congestion and prior midline sternotomy. She reported having been out of medications for a while. She was transferred for admission to College Station Medical Center.
Mrs. Brandt was treated for a diabetic foot ulcer from February 27, 2015, through at least March 13, 2015. On February 27, 2015, she reported her blood sugars were averaging 200's daily. It was noted she had uncontrolled diabetes. On March 13, 2015, her blood pressure was 183/81.
Blood work completed on May 9, 2015, showed Mrs. Brandt's HgbA1c was 9.4% (reference range 4-6%), with an estimated average glucose of 212 mg/dL.
Mrs. Brandt presented to the emergency room on October 30, 2015, with shortness of breath and cool, pale, slightly cyanotic skin. It was noted she had a history of heart attack, coronary artery disease with coronary artery bypass graft x5 in 2010, congestive heart failure, type 2 diabetes, hypertension, hyperlipidemia and peripheral artery disease.
She reported having been sick for five days. It was noted someone came to repossess her car, she became upset and developed chest pain followed by shortness of breath. In the emergency room she quickly deteriorated to cardiopulmonary arrest. Resuscitative efforts were unsuccessful.
... Mrs. Brandt passed away due to cardiac arrest in the setting of ischemic coronary artery disease and hypertensive heart disease. These dated back to July 25, 2015. She had a significant cardiac history prior to July 25, 2015, including myocardial infarction and five vessel bypass. She had an exacerbation of her congestive heart failure in November of 2014, which is a life threatening condition.
In addition, Mrs. Brandt had chronic uncontrolled diabetes and hypertension, both of which are risk factors for the progression of congestive heart failure. The records document she was not following with a cardiologist as would be expected with her significant cardiac history.
Mrs. Brandt had a life threatening condition of severe coronary artery disease and chronic ongoing uncontrolled diabetes and hypertension. These were life threatening as of July 25, 2015, and persisted and ultimately resulted in her death on October 30, 2015.
Plaintiff does not dispute the existence of any of the conditions cited above but does dispute that these conditions constitute a Life Threatening Condition as defined in the Policy. Stated differently, the parties dispute whether these health conditions constitute a "critical health condition that possibly could result in [the] dependent's loss of life." More specifically, the real point of controversy seems to focus on the word "critical." Clearly, someone who has coronary artery disease, uncontrolled diabetes, or congestive heart *695 failure-all of which Mrs. Brandt was diagnosed with-could be in danger of dying. By definition, each "possibly could result in [the] dependent's loss of life."
Plaintiff's main attack on the policy language and Unum's ultimate decision is that at the time the Policy was initiated, the Decedent did not have a "critical health condition." Plaintiff equates the adjective "critical" with "the patient is in critical condition," the context in which the word would normally be used in a hospital setting. Another way of phrasing Plaintiff's position is that critical means "emergent"-some condition with the possibility of immediate consequences. Plaintiff argues both that the term is unambiguous and that Mrs. Brandt did not have a critical condition, or in the alternative, that the term is ambiguous. If this Court finds "critical" to be ambiguous in its context within the Unum Policy, then it must construe the Policy against its drafter, which in this case would be Unum.
Unum argues that the entire phrase is unambiguous and that it quite broadly encompasses anyone with a life-threatening health condition, regardless of the possibility of an immediate crisis. In other words, an individual who has a very serious life threatening situation that clearly can result in loss of life is Totally Disabled, though the ultimate timing of any problem may be some indeterminate time in the future. To put it in everyday usage terms, Unum basically interprets "critical" to mean "serious."
This Court has performed an informed survey of the word "critical." It first consulted general dictionaries and then looked to medical dictionaries, and the results, in pertinent part, are as follows:
A. General Dictionaries-Definition of "Critical"
Merriam-Webster's Dictionary 435 (2008):
...pertaining to the crisis or turning point of a disease; pertaining to any crisis; attended with danger or risk; dangerous; hazardous.
4 Oxford English Dictionary 30 (2d ed. 1991):
4. Med. Relating to the crisis or turning point of a disease; determining the issue of disease, etc.;
5. of the nature of, or constituting, a crisis: a. of decisive importance in relation to the issue.
Webster's Third New International Dictionary 538 (2002):
...of, relating to, or being a turning point or specially important juncture; indicating or being the stage of a disease at which an abrupt change for better or worse may be anticipated with reasonable certainty.
Webster's New International Dictionary 627 (2d ed. 1957):
3. pertaining to or indicating a crisis, turning point, or specially important juncture; of the nature of, or constituting, a crisis; decisive.
Webster's New World Dictionary 180 (1969):
4. of or forming a crisis; decisive;
5. dangerous or risky; causing anxiety.
Webster's Ninth New Collegiate Dictionary 307 (1990):
la. of, relating to, or being a turning point or specially important juncture:
(1) relating to or being the stage of a disease at which an abrupt change for better or worse may be expected; also: being or relating to an illness or condition involving danger of death.
Random House Webster's College Dictionary 317 (2000):
6. caused by or constituting a crisis;
7. of decisive importance; crucial;
*696 9. (of a patient's condition) having unstable or abnormal vital signs and one or more unfavorable indicators.
American College Dictionary 287 (1970):
5. pertaining to, or of the nature of, a crisis; of decisive importance with respect to the outcome; crucial;
6. involving suspense, risk, peril, etc.; dangerous.
American Heritage Dictionary 341 (2d College ed. 1982):
6. Med. Of or pertaining to a crisis.
Merriam-Webster Online Dictionary:
...of, relating to, or being a turning point or specially important juncture, a critical phase: such as (1): relating to or being the stage of a disease at which an abrupt change for better or worse may be expected; also: being or relating to an illness or condition involving danger of death.
Cambridge Online Dictionary:
Very bad or dangerous.
Oxford Online Dictionary:
3. (of a situation or problem) having the potential to become disastrous; at a point of crisis. 3.1 Extremely ill and at risk of death.
B. Medical Dictionaries-Definition of "Critical"
Tabor's Cyclopedic Medical Dictionary C-129 (14th ed. 1983):
1. pertaining to a crisis.
2. dangerous.
Blakiston's Gould Medical Dictionary 335 (4th ed. 1979):
1. pertaining to or characterized by a crisis;
3. of decisive importance as regards outcome; crucial;
4. involving grave uncertainty or risk; perilous.
2 Attorneys' Dictionary of Medicine C-500 (2013):
1. in a condition dangerous to life; involving a crisis.
Stedman's Medical Dictionary 428 (27th ed. 2000):
1. denoting or of the nature of a crisis;
2. denoting a morbid condition in which death is possible;
3. in sufficient quantity as to constitute a turning point.
Dorland's Illustrated Medical Dictionary 434 (32d ed. 2012):
1. pertaining to or of the nature of a crisis;
2. pertaining to a disease or other morbid condition in which there is a danger of death;
3. in sufficient quantity as to constitute a turning point.
Importantly, each of these dictionaries, with one exception, all portray "critical" as pertaining to a turning point, an important juncture, or the stage at which a situation will abruptly change for better or worse. The medical dictionaries concur. Their definitions each convey the sense of a crisis or turning point.
Unum claims, not without some justification, that this case and the case of Walton v. Unum Life Ins. Co. of Am. , No. 16-12518, 2017 WL 9470789 (E.D. Mich. Aug. 20, 2017) are quite similar, and therefore this Court should similarly rule that Unum's denial of coverage was proper. A close comparison of the two medical chronologies, however, leads one to a different conclusion:
*697 Michael Walton's Medical Records* Mary Brandt's Medical Records* *Although other hospitalizations may demonstrate ongoing problems such as hypertension or hyperlipidemia (which may be related) shaded cells contain recorded instances of medical treatment related to the heart 2000S 2003: Walton was hospitalized multiple times for pericarditis. 2004: Walton underwent a pericadiectomy. Sometime between 2008 and 2010: Mrs. Brandt underwent a five-vessel bypass [These records were never obtained.] 2013 Aug. 2013: Walton was hospitalized for acute heart failure, atrial fibrillation, and rapid Ventricular rate. Nov. 2013: Walton was hospitalized for heart failure and underwent a heart catheterization. He was also diagnosed With acute systolic heart failure restrictive cardiomyopathy, moderate pulmonary hypertension, liver dysfunction, and 50 pounds of abdominal and thigh fluid retention. 2014 Feb. 2014: Walton underwent surgery to insert a pacemaker. Aug. 2014: Mrs. Brandt was hospitalized for boil on left buttock. Examination revealed a grade 4 systolic murmur. Her blood pressure was 197/86, and she was diagnosed with abscess, hypertension, and smoking cess[ation].
*698 Nov. 15, 2014: Mrs. Brandt was seen in Emergency Room for problems breathing. The records describe this incident as "moderate." There was no report of chest pain, and tests showed a mild pulmonary vascular prominence and an tests showed a mild pulmonary Discharge diagnosis was congestive heart failure. She was transferred to College Station. [These records were never obtained.] Dec. 2014: Welton was hospitalized with heart failure and worsening lower exteremity edema 2015 February Feb. 2015: Walton visited the emergency room complaining of lower extremity edema and Feb. 27, 2015: Mrs. Brandt was treated for diabetic shortness of breath. He was admitted for three foot ulcer. Diabetes was noted to be uncontrolled, days. March Mar. 2015: Walton was re-admitted for weight Mar. 6, 2015: Mrs. Brandt was treated for diabetic gain and swelling; foot ulcer (records noted history of: "NIDDM × 10 years, HTN and hyperlipidemia, CABG × 5-2010"). May Between August of 2013 and March of 2015, 2010"). Walton was hospitalized five times for heart failure and cardiomyopathy (chronic Mar. 13, 2015: Mrs. Brandt underwent wound care conditions) and cirrhosis of the liver. for her foot. Her blood pressure was 183/81. May 9, 2015: Mrs. Brandt underwent lab work (results: HgbAlc 9.490 (ref. range 4.690); Est. average glucose 212 mg/dl). June June 2015; Walton was diagnosed with atrial fibrillation, cadiomyopathy, and hypertensive heart disease. Tests revealed that he also suffered from restrictive cardiomyopathy, chronic atrial fibrillation, hypertension with hypertension heart disease, peripheral vascular occlusive disease, moderate coronary artery disease, mild LAD bridging, severely elevated RT atrial pressure, and coagulopathy. July July 1, 2015: Walton Applied for Life July 25, 2015: The Brandts Applied for Life Insurance Insurance July 2015; Walton was admitted for fainting; his diagnosis included liver failure, coagulopathy, renal failure, and constrictive myopathy and systolic heart failure. August Aug. 2015: Walton was transferred to hospice, where he died two days later due to acute coronary syndrome, which was caused by; systolic heart failure due to HTN due to cirrhosis of one year's duration. Oct. 30, 2015: Mrs. Brandt died Of myocardial October infarction
As one can see, Walton had multiple life threatening situations before he applied for life insurance that continued right up to his death. Walton was hospitalized with serious heart/circulatory and liver problems seven times in less than two years preceding the application for insurance. Immediately before the application, Walton was hospitalized for atrial fibrillation, cardio myopathy (heart disease ), and hypertensive heart disease. Immediately after applying on July 1, 2015, he was hospitalized again for heart failure (among other problems) and then passed away in August of 2015. Mrs. Brandt's case is somewhat different. While it is true she had several hospitalizations that preceded her death, only one, the hospitalization of November 15, 2014, involved a life threatening situation. The remainder of her hospitalizations *699 primarily dealt with problems pertaining to her diabetes. While diabetes and hypertension and their complications are well-known and can be quite serious, individuals with these conditions also live successful and productive lives for decades. The record also notes bypass surgery some 8-10 years before her death, but the actual records pertaining to this hospitalization or even of her post-November 15, 2014 treatment in College Station are not in the record.
This Court agrees with Unum that the Policy terms are not ambiguous; however, it agrees with Plaintiff that Mrs. Brandt did not have a critical health condition when the Brandts applied for insurance. Consequently, the Policy took effect, and the denial of benefits was wrongful.
In the instant case, Unum seems to conflate a serious health condition with a critical health condition. This becomes obvious when one looks at how "serious" is defined in the same context:
15 Oxford English Dictionary 15-16 (2d ed. 1991):
6.a. weighty, important, grave; considerable, not trifling;
6.b. attended with danger; giving cause for anxiety.
Webster's Third New International Dictionary 2073 (2002):
4.a. important, significant, emphatic;
4.c. such as to cause considerable distress, anxiety, or inconvenience: attended with danger.
Webster's New International Dictionary 2286 (2d ed. 1957):
8. giving rise to apprehension; attended with danger; as, a serious injury.
Webster's New World Dictionary 677 (1969):
6. giving cause for anxiety; dangerous: as, a serious wound.
Random House Webster's College Dictionary 1201 (2000):
6. giving cause for apprehension; critical or threatening.
American College Dictionary 1106 (1970):
6. giving cause for apprehension; critical: a serious illness.
American Heritage Dictionary 1120 (2d College ed. 1982):
1. grave in character, quality, or manner;
3. concerned with important rather than trivial matters; weighty;
5. causing anxiety.
New Webster's Dictionary 880 (1981):
...attended with danger; giving rise to apprehension.
Merriam-Webster Online Dictionary:
4b. having important or dangerous possible consequences // a serious injury.
Cambridge Online Dictionary:
Severe in effect; bad.
Oxford Online Dictionary:
3. Significant or worrying because of possible danger or risk; not slight or negligible.
Unum summarizes Plaintiff's argument as follows: to suffer from a Life Threatening Condition, one must be "very sick or injured and ... likely to die." It argues that one can have a Life Threatening Condition without being on the brink of death. To illustrate its point, Unum uses a hypothetical HIV positive person. It argues under Plaintiff's logic a person who was HIV positive "would not have a life-threatening condition under the Group Policy if she were not currently dying of an infection with acquired immunodeficiency syndrome ("AIDS")." (Doc. No. 25 at 10-11). This portrayal is perhaps a little extreme. Clearly, several decades ago being HIV positive was a condition that almost always eventually resulted in death. While HIV
*700 remains serious today, fortunately, medical science has improved the treatment over the intervening years. Nevertheless, one who is HIV positive has a "serious condition" that could be life threatening, but does that person have a "critical health condition"? It may depend.
Unum's own example of an HIV positive person undercuts its own use of the word "critical." For example, probably the most well-known individual who is HIV positive is the great basketball star Earvin "Magic" Johnson, Jr. He announced he was HIV positive in 1991, twenty-eight years ago. Is his condition possibly life threatening? Most individuals would say yes. But is it at a crisis stage or a turning point as the usage of the word critical connotes? Most would say no.[4]
VIII. Conclusion
This Court finds that Unum did not violate any of Plaintiff's rights in the manner in which it handled and processed Plaintiff's claim, the denial, and the appeal therefrom. It cannot agree, however, with Unum's ultimate conclusion. There is no doubt Mrs. Brandt had at least two serious medical conditions (coronary artery disease and diabetes ) that were complicated by her hypertension, weight, and smoking. These conditions were serious and possibly life threatening.[5] Nevertheless, this Court does not find in July and August of 2015 (when Plaintiff applied and Unum received the application) that either of these conditions was a critical health condition as that term is used either by the general population or in medical parlance.[6]
Therefore, this Court grants Plaintiff Henry Brandt's Motion for Summary Judgment (Doc. No. 20) and denies Defendant Unum Life Insurance Company's Motion for Summary Judgment (Doc. No. 19).

The parties use conflicting dates. Plaintiff in his briefing states the actual bypass surgery was in 2008 while Defendant, based upon the date in the medical records, uses 2010. The actual records from this surgery are not in the record. The Unum adjuster's notes from the 2015 interview with Plaintiff state that Plaintiff acknowledged that the Decedent had the surgery "8-9 years ago." (Doc. No. 19, Ex. B at 123).

The Court notes that one document in the record describes July 24, 2015 as the enrollment date, while the date of August 5, 2015 is mentioned in correspondence from Unum to Brandt. The exact date is not an important factor in the overall analysis of this case.

Assuming the Brandts were both healthy and the regular contract provisions controlled, the insurance would have activated as follows:
"WHEN DOES YOUR LIFE INSURANCE CO VERA GE BEGIN?...
You pay 100% of the cost of yourself for any benefit unit. You will be covered at 12:01 a.m. on the later of:...
- the first of the month coincident with or next following the date you apply for insurance, if you apply within 31 days after your eligibility date, for any amount of insurance not subject to evidence of insurability...."
"WHEN ARE YOUR DEPENDENTS ELIGIBLE FOR COVERAGE?
The date your dependents are eligible for coverage is the later of:
- the date your insurance begins..."
(Doc. No. 19, Ex. B. at 597) (Unum's denial letter, quoting pertinent provisions of the Policy).

Obviously, this Court has no records or inside knowledge of the medical status of Magic Johnson. It uses him as an example for two reasons. First, Unum used an HIV positive individual as an analogy in its briefing, and Mr. Johnson is probably the most well-known HIV positive person in the world. Second, Mr. Johnson has not only lived with this condition for years, but his life has also served as an inspiration for thousands of others.

The Court realizes that Unum might assert that "the proof is in the pudding"-Decedent had severe coronary disease, and within three months of applying for the Policy, she died of a heart attack. The court in Walton says as much, but this kind of analysis benefits from 20-20 hindsight. This Court instead focuses its analysis on the Decedent's medical condition when she applied for the Policy in July of 2015, not on her date of death in October of 2015.

The Court notes that if its analysis of the word "critical," including its use of both lay and medical dictionaries, is misplaced, then it would find the Policy to be ambiguous and would thus still reach the same conclusion.